**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CS WANG & ASSOCIATE, SAT NARAYAN dba EXPRESS HAULING, ROBERT MEYER dba MANGIA NOSH, and TASIR TAYEH dba CHIEF'S MARKET, individually and on behalf of all others similarly situated, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 16 C 11223 |
| WELLS FARGO BANK, N.A., FIFTH THIRD BANK, FIRST DATA MERCHANT SERVICES LLC, VANTIV, INC., NATIONAL PROCESSING COMPANY, INTERNATIONAL PAYMENT SERVICES, LLC dba ELITEPAY GLOBAL and dba PRIMEPAY GLOBAL, BRIAN BENTLEY, ANDREW BENTLEY, ADAM BENTLEY, IRONWOOD FINANCIAL, LLC dba IRONWOOD PAYMENTS, DEWITT LOVELACE and JOHN LEWIS, | ) ) ) ) ) ) ) ) ) ) ) ) | Judge Rebecca R. Pallmeyer |
| Defendants. | ) ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Plaintiffs CS Wang & Associate, Sat Narayan d.b.a. Express Hauling, Robert Meyer d.b.a. Mangia Nosh, and Taysir Tayeh d.b.a. Chief's Market are all small businesses located in California. The Plaintiffs launched this putative class action against a dozen different defendants for alleged violations of the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code § 630 *et seq.* Their claim is, in essence, that two of the defendant corporations, International Payment Services, LLC ("IPS") and Ironwood Financial, LLC ("Ironwood"), secretly recorded them during telemarketing calls. (Amended Complaint [88], ¶¶ 106–08.) IPS and Ironwood made these calls in the attempt to sell credit and debit card payment processing services and hardware to the Plaintiffs on behalf of fellow Defendants Wells Fargo Bank, N.A.; First Data Merchant Services LLC; Fifth Third Bank; Vantiv, Inc.; and National Processing Company ("NPC"). (*Id.* at ¶ 9.)

Named as additional Defendants in Plaintiffs' lawsuit are the owners of IPS and Ironwood: Brian, Andrew, and Adam Bentley ("the Bentleys"; together with IPS, "the IPS Defendants"); and Dewitt Lovelace and John Lewis, respectively. The Plaintiffs seek to hold the Bentleys personally liable because they allegedly created and implemented "the system of secretly recording telephone calls with sales targets" at IPS despite knowing their actions were illegal. (*Id.* at ¶ 74.) Plaintiffs seek the same from Lovelace and Lewis because they allegedly "refined and expanded" the program after purchasing IPS's telemarketing operations for Ironwood in 2015. (*Id.* at ¶¶ 92, 94.)

Plaintiffs bring this suit on behalf of four putative classes of California businesses, all of which received telemarketing calls from either IPS or Ironwood, but did not sign contracts with them. (*Id.* at ¶ 109.) The Amended Complaint asserts eighteen counts for relief arising from the Defendants' alleged violations of two provisions of CIPA: Cal. Penal Code §§ 632 and 632.7. Section 632 prohibits the nonconsensual recording of confidential communications transmitted using any variety of telephone. Section 632.7 prohibits the nonconsensual recording of any communications that involve at least one cellular or cordless telephone. Plaintiffs assert that every Defendant violated both of these provisions. (*See* Am. Compl. ¶¶ 123–290.) Plaintiffs seek to permanently enjoin the Defendants from recording further telephonic communications without consent, and seek damages from each Defendant in the amount of $5,000 per violation of section 632 or 632.7. (*See, e.g., id.* at 27.)

Defendants have filed a total of five motions to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1), (b)(2), and (b)(6).[1] Each motion raises those defenses unique to its group

---

[1] The groups and their respective motions to dismiss are: (1) Ironwood (*see* Ironwood Financial, LLC's Motion to Dismiss [94] ("Ironwood MTD")); (2) Ironwood's owners Lovelace and Lewis, as individuals (*see* Dewitt Lovelace and John Lewis' Motion to Dismiss [97] ("Lovelace MTD")); (3) Wells Fargo and First Data (*see* Defendants Wells Fargo Bank, N.A. and First Data Merchant Services LLC's Motion to Dismiss Plaintiff's Amended Complaint [102] ("Wells Fargo MTD")); (4) Fifth Third Bank, Vantiv, and NPC (*see* Defendants Fifth Third Bank, Vantiv, Inc., and NPC's Motion to Dismiss [105] ("Fifth Third MTD")); and (5) the IPS

of Defendants, and adopts any defense shared with the others.   Broadly speaking, all Defendants argue that (1) Plaintiffs lack Article III standing to sue for relief under CIPA based on *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016), because they did not suffer a concrete injury; (2) CIPA only protects individuals, not businesses, and Plaintiffs therefore lack "statutory standing" to sue; (3) the Section 632 claims fail because "routine business communications" are not "confidential" as a matter of law and because Plaintiffs reasonably expected that their calls would be recorded; and (4) the Section 632.7 claims fail because Plaintiffs failed to allege that the calls were made using the required type of equipment.[2]  (*See, e.g.,* Memorandum in Support of Wells Fargo MTD [103] ("Wells Fargo Opening Br."), 6–7; Memorandum of Law in Support of Ironwood MTD [96] ("Ironwood Opening Br."), 3–10.)

Beyond these common objections, Lovelace and Lewis and the IPS Defendants also object to the court's exercise of personal jurisdiction over them, as they claim that Plaintiffs have failed to establish those Defendants' minimum contacts with the State of Illinois.  (Memorandum in Support of IPS Defs. MTD [110] ("IPS Defs. Opening Br."), 11–15; Memorandum of Law in Support of Lovelace MTD [99] ("Lovelace Opening Br."), 3–6.)  Lovelace and Lewis argue only that the court lacks personal jurisdiction over them as individuals independent from their ownership of Ironwood.  The IPS Defendants, for their part, assert that neither the Bentleys as individuals nor IPS as a company are subject to personal jurisdiction in Illinois.  (IPS Defs. Opening Br. 11–15; Reply Memorandum in Support of IPS Defs. MTD [128] ("IPS Defs. Reply Br."), 18–21.)   Finally, the majority of the Defendants—all but Ironwood and the IPS Defendants—argue that the Amended Complaint does not allege facts sufficient to hold them legally accountable for any secret recordings allegedly made by Ironwood and IPS.  These

Defendants, on behalf of both IPS and the Bentleys as individuals (*see* Renewed Motion to Dismiss all Causes of Action against the IPS Defendants [109] ("IPS Defs. MTD")).

[2]     Unlike the other Defendant groups, the IPS Defendants do not explicitly adopt other Defendants' theories (*see, e.g.,* Lovelace MTD 2.)  The IPS Defendants nevertheless advance the same legal arguments as the other Defendants and the court addresses them together.

Defendants claim that the Plaintiffs' "threadbare and conclusory allegations" of control over (or ratification of) Ironwood and IPS's activities do not state a plausible claim for relief against them under CIPA. (Lovelace Opening Br. 2, 7–9. *See also* Wells Fargo Opening Br. 8–12; Memorandum of Law in Support of Fifth Third MTD [107] ("Fifth Third Opening Br."), 3–5.)

In addition to their motions to dismiss, Lovelace and Lewis and the IPS Defendants have each filed identical Motions for Rule 11 Sanctions against Plaintiffs' counsel, the Cherry Firm. (Motion for Rule 11 Sanctions [119] ("Lovelace Sanctions Mot."); Motion for Sanctions [129] ("IPS Defs. Sanctions Mot.").) The Sanctions Motions, which rely on the same set of facts and largely overlap, assert that this lawsuit is based on "patently false allegations" derived from a disgruntled former employee of IPS and Ironwood, James Tibor. (Lovelace Sanctions Mot. ¶ 2.) Those Defendants request that the court sanction Plaintiffs' counsel by dismissing all claims against Lovelace and Lewis and the IPS Defendants, and by ordering Plaintiffs' counsel to pay attorneys' fees.

For the reasons stated below, the court denies all of the Defendants' Motions to Dismiss [94, 97, 102, 105, 109]. The court also denies the Defendants' Motions for Rule 11 Sanctions [119, 129] without prejudice, pending further discovery.

## BACKGROUND

### 1.     The Telemarketing Scheme and Alleged Secret Recordings

Plaintiffs are all partnerships or sole-proprietorships located in Northern California. In order to accept payment by customers using VISA or Mastercard credit and debit cards, businesses like Plaintiffs must have a relationship with a bank that is a member of the VISA and Mastercard systems. (Am. Compl. ¶ 37.) These banks (called acquiring banks, or "acquirers") process all of the credit and debit card transactions at a given business (or "merchant") in exchange for a percentage fee of each transaction. (*Id.* at 37–38.) According to Plaintiffs, "[a]cquiring merchants is big business" and acquiring banks will often compete with each other

for merchants so that they can process more transactions and earn more money in processing fees. (*Id.* at ¶ 39.) Defendants Wells Fargo and Fifth Third are some such acquiring banks.

Other parties participate in the card processing market as well. Acquiring banks often work with outside technology firms ("third party processing agents," or "processing TPAs") to help manage the enormous volume of data that comes with processing billions of card transactions nationwide. (*Id.* at ¶ 42.) Processing TPAs also make and sell the hardware—like PIN pads—used to facilitate card transactions. (*Id.* at ¶ 47.) Throughout the time period relevant to this lawsuit, Defendant First Data worked with Wells Fargo as a processing TPA. Defendants Vantiv and NPC had the same arrangement with Fifth Third. (*Id.* at ¶¶ 44–46.) Acquiring banks also farm out their sales and marketing functions to "third party sales agents" ("sales TPAs"), who then solicit merchants on behalf of an acquiring bank in exchange for a cut of the bank's processing fees. (*Id.* at ¶¶ 40, 41). Among other sales tactics, employees at sales TPAs make telemarketing calls to merchants in an attempt to sell credit and debit card processing services and hardware for an acquiring bank and affiliated processing TPA. (*Id.* at ¶¶ 48, 49.)

Defendant IPS is a Nevada corporation that once operated telemarketing call centers in Chicago and Naperville, Illinois. (*Id.* at ¶ 26.) IPS is owned and controlled by Defendants Brian, Adam, and Andrew Bentley—all residents of Utah. (*Id.* at ¶¶ 3, 16, 28–30.) At various times, IPS served as a sales TPA for all of the Defendants mentioned above and made telemarketing calls on their behalf. From 2011 to 2014, IPS was employed by Wells Fargo and First Data to market their processing services and hardware from the Chicago call center. (*Id.* at ¶¶ 53, 57.) In the course of its arrangement with Wells Fargo, IPS's employees made thousands of telemarketing calls to California businesses every day, including to Plaintiffs. (*Id.* at ¶ 5.) Plaintiffs allege that "IPS surreptitiously recorded each and every one of these phone calls and stored the recordings on a cloud-based system accessible from the internet." (*Id.* at ¶¶ 6, 68–70.) IPS employees, Plaintiffs claim, "never made any disclosure of any kind to recipients of its

calls that the calls were recorded." (*Id.* at ¶ 69.) As a result, the Plaintiffs and other call recipients were unaware that their communications were being recorded—and therefore did not consent. (*Id.*)

According to Plaintiffs, IPS's telemarketers were required to follow a set script on all of their calls: they would introduce themselves and IPS the same way, describe the products and services on offer, and tell call recipients that IPS was "with Wells Fargo." (*Id.* at ¶ 60.) These scripts apparently did not include a request for permission to record the call, or even an acknowledgement that the call would be recorded. (*Id.* at ¶ 69.) Plaintiffs allege that Wells Fargo reviewed and approved the contents of IPS's sales script. (*Id.* at ¶ 61.) IPS also utilized "Caller ID Spoofing": the practice of masking a caller's true phone number and instead displaying a local phone number. (*Id.* at ¶ 64.) Plaintiff characterizes "Caller ID Spoofing" as "a widely practiced strategy in the telemarketing industry that tricks business owners into believing they are receiving a phone call from a local customer instead of an out of state sales call." (*Id.* at ¶ 65.) "Because of this practice, Plaintiffs and class members had no idea they were receiving a telemarketing call until recording had already begun." (*Id.* at ¶ 66.)

Plaintiffs also claim that, as "the topic of the call was business-related," a merchant that received a call from IPS would reasonably have expected that the call would remain confidential: "a business's method of processing credit and debit card transactions is by its nature sensitive and confidential." (*Id.* at ¶¶ 5, 62.) Given that the purpose of the sales calls was to sell merchants processing services and hardware, Plaintiffs allege that IPS's representatives would ask business owners "to disclose their business's monthly or annual credit and debit card sales volume." (*Id.* at ¶ 66.) That information, Plaintiffs note, "is sensitive and confidential and of significant value to that owner's competitors, vendors, and commercial real estate lenders." (*Id.*) Plaintiffs assert that the practice of Caller ID Spoofing also played a role in generating an expectation of privacy on the part of a merchant answering a telemarketing call. (*Id.* at ¶ 63.)

IPS stored its recordings in a cloud-based system provided by Veracity Networks, LLC. Veracity is not named as a defendant in Plaintiffs' suit. Plaintiffs allege that other IPS employees would use the recordings to confirm that merchants had agreed to in-person follow-up meetings with IPS sales representatives and as "tools to learn more about potential sales targets and tailor their sales presentation with that information." (*Id.* at ¶¶ 71, 72.) "The recordings were not used to improve customer service or train customer service personnel." (*Id.* at ¶ 73.)

Plaintiffs allege that the Bentleys devised and implemented the scheme of secretly recording phone calls during meetings that occurred in IPS's Chicago call center around the time they opened in it in 2011. (*Id.* at ¶ 74.) The Bentleys also were the ones who engaged Veracity to provide the technology services necessary to store the recordings. (*Id.* at ¶ 76.) They visited the Chicago call intermittently after 2011. During these visits, and during further telephonic meetings, an IPS employee "repeatedly cautioned Andrew Bentley . . . that the IPS practice of secretly recording telephone calls to California businesses was illegal," but Bentley ignored those warning and continued the practice of recording calls unabated. (*Id.* at ¶ 75.)

IPS moved its Illinois operations from Chicago to Naperville sometime in 2014. (*Id.* at ¶ 74.) During this changeover, the Bentleys returned to Illinois and implemented the same recording scheme that had existed in the Chicago call center. (*Id.* at ¶ 74.) Later in 2014, IPS discontinued its relationship with Wells Fargo and First Data, and began making telemarketing calls for Fifth Third and its processor TPAs, Vantiv and NPC. (*Id.* at ¶¶ 85, 86). According to Plaintiffs,

> IPS's telemarketing, sales, and customer service practices on behalf of Fifth Third, Vantiv, and NPC were identical in all respects to those it undertook on behalf of Wells Fargo and First Data and described above and incorporated here. IPS specifically continued its practice of surreptitiously recording confidential communications with Plaintiffs and class members. Fifth Third had actual knowledge that IPS call scripts stated that IPS was "with Fifth Third" because Fifth Third was provided with call scripts containing that language for approval, which Fifth Third did approve and ratify the use of.

(*Id.* at ¶ 89.)

In 2015, IPS sold all of its telemarketing operations to Ironwood, a Mississippi corporation headquartered in Salt Lake City, Utah. (*Id.* at ¶¶ 27, 92.) The work performed at the Naperville call center continued uninterrupted despite this change in control. (*Id.* at. ¶ 93.) "Key IPS personnel, including telemarketers and field representatives, immediately joined Ironwood and continued their work on behalf of Fifth Third, Vantiv, and NPC." (*Id.*) Ironwood's sales practices again "were identical in all material respects to those carried out by IPS." (*Id.* at ¶ 102.) Ironwood's owners, Lovelace and Lewis, traveled from their homes in Mississippi to visit the Naperville site. Lovelace and Lewis, Plaintiffs allege, received and ignored warnings that the secret recording practices were illegal. (*Id.* at 94.) The two owners also "refined and expanded" the call-recording program by replacing Veracity's cloud storage system with an enhanced cloud storage and customer management system provided by Integrated Reporting is Simple, LLC ("IRIS"). (*Id.* at ¶ 96.) Like Veracity, IRIS is not party to this lawsuit. Overall, Plaintiffs clarify that despite the changes in ownership and clients served, "the course of conduct carried out by the respective acquiring banks, sales TPAs, and processor TPAs was identical in all material respects and the factual allegations made against one of them . . . apply equally to other Defendants in each category." (*Id.* at ¶ 103.)

2.    **Other Defendants' Alleged Control over IPS and Ironwood's Activities**

Plaintiffs allege that the details of the relationship between IPS and Ironwood and their acquiring banks and processor TPAs establish that those other Defendants both knew about and approved of the practice of recording phone calls. For example, before starting its sales work for Wells Fargo in 2011, IPS entered into a "Marketing Agreement" with Wells Fargo and First Data which outlined the relationship between the parties. This Marketing Agreement stated "that IPS would act as an agent of both Wells Fargo and First Data when soliciting merchants." (*Id.* at ¶ 58.) IPS, and later Ironwood, entered into a virtually identical contract with Fifth Third, Vantiv, and NPC. (*Id.* at ¶¶ 88, 92.) IPS and Ironwood's relationships with these

two acquiring banks were further governed by rules promulgated by VISA and Mastercard. VISA's rules, for example, required Wells Fargo and Fifth Third to provide sales training and education, provide policies and procedures for complying with industry-related laws, and regularly review the call centers' solicitation materials and practices. (*Id.* at ¶¶ 51, 92.) To facilitate compliance, as well as to supervise the marketing work at IPS and Ironwood, Plaintiffs allege, the processor TPA-Defendants (First Data, Vantiv, and NPC) employed sales representatives who were assigned to the call centers. (*Id.* at ¶¶ 55, 56.) These representatives were tasked with supervising the telemarketing work and ensuring compliance with the VISA rules and applicable laws. (*Id.*) Finally, and as previously stated, the standard telemarketing "script" also included a disclosure by the caller that they were "with" either Wells Fargo or Fifth Third. (*Id.* at ¶¶ 60, 97.). These scripts were allegedly reviewed and approved by the two banks. (*Id.* at ¶¶ 61, 98.)

Plaintiffs allege that Defendants First Data, Vantiv, and NPC (the processor TPAs) had an additional reason to know of the existence of the secret recordings: they actually listened to them. (*Id.* at ¶¶ 78–83, 90-91, 99-100.) When a merchant agreed to purchase hardware through IPS or Ironwood, the processor TPA-Defendants would ordinarily call the merchants directly to confirm the sale, but they would also often request the call recordings to confirm the sales. (*Id.* at ¶¶ 79, 80.) IPS personnel assured the three organizations that "all calls to merchants were recorded and available to be requested." (*Id.* at ¶ 81.) Because the recordings never included disclosure by the telemarketers or consent by the merchants, Plaintiffs assert, First Data, Vantiv, and NPC had actual knowledge that the calls were secretly recorded. (*Id.* at ¶¶ 81, 90, 99.) Thus, Plaintiffs allege, First Data, Vantiv, and NPC "benefitted from and ratified IPS's practice" of making secret recordings of the telemarketing calls. (*Id.* at ¶¶ 82, 90, 100.) Finally, IPS and Ironwood's websites and marketing materials disclosed their affiliation with the various processor TPAs, and "prominently featured" those organizations' logos. (*Id.* at ¶¶ 84,

91, 101.)  The same was true for the processor TPAs' marketing material and websites with respect to IPS and Ironwood.  (*Id.*)

### 3.      The "Whistleblower"

Plaintiffs assert that information at the core of the Amended Complaint comes from an alleged whistleblower: a former employee of IPS and, later, Ironwood who was fired after he "repeatedly cautioned" Defendants the Bentleys, Lovelace, and Lewis that their marketing activities violated California law.  (*Id.* at ¶¶ 74, 94-95, 104.)  This whistleblower later contacted Plaintiffs' counsel, Myron M. Cherry & Associates, LLC ("the Cherry Firm"), with "detailed information regarding the pattern of secretly recording phone calls" the Defendants made to California businesses.  (*Id.* at ¶ 104.)  The named Plaintiffs were unaware of any secret recordings until after they talked to the Cherry Firm.  (*Id.*)

The Defendants' Motions for Rule 11 Sanctions tell a very different story.  They claim that the Plaintiffs' unnamed whistleblower, identified by Defendants as James Tibor, was not fired in retaliation for a failure to keep quiet about secret recordings, but in response to the results of a criminal background check.  (Lovelace Sanctions Mot. ¶ 2.)  After Ironwood purchased IPS's Illinois assets in 2015, it chose to retain Tibor as the General Manager of its Naperville call center.  (*Id.* at ¶ 9.)  Then, on June 14, 2016, as Ironwood was beginning its relationship with data storage-provider IRIS, the Human Resources department decided to run criminal background checks on the management team who had "access to personal information . . . contained in IRIS."  (Nobbs Decl., Ex. 2 to Lovelace Sanctions Mot. [121], ¶ 4) (internal citation and quotations omitted).  Tibor consented to the background check, but declined the opportunity to disclose any potential issues to Human Resources in advance.  (*Id.* at ¶¶ 4–5.)

The results of the background check were troubling.  Defendants learned that James Tibor had a lengthy criminal history for offenses of dishonesty.  These offenses included three Illinois state convictions for forgery and one for "theft by deception greater than $100,000," all dating back to 2003.  (County Criminal Court Check, Ex. 2.C to Lovelace Sanctions Mot. 81–

85.)  In addition, the background check disclosed a federal indictment for five counts of mail and wire fraud.  Tibor had pleaded guilty to one count of wire fraud on February 24, 2009, and was sentenced to 77 months imprisonment to run consecutively with the 52-month state sentence he was already serving.  (U.S. District Court Judgment, Ex. 4 to Lovelace Sanctions Mot. 160–61.)  Ironwood informed Tibor of the results of his background check on June 20, 2016; Ironwood fired Tibor shortly thereafter, on June 23, 2016.  (Nobbs Decl. ¶ 7.)

Tibor's shadow over the present case, Defendants allege, arose the day he was fired.  On June 23, Tibor sent an e-mail to Ironwood HR Manager Richard Nobbs,[3] stating:

> I am alerting that Ironwood is engaging in illegal activity.  They record 14,000-18,000 calls a day without the knowledge and consent of the other party.  I've reported this to the old owners [the Bentleys] and repeatedly reported it to the new ones [Lovelace and Lewis].  After refusing to engage in this illegal activity, I was threatened to be fired if I persisted in my objections.  Please help me stop this illegal activity.

(E-mail from James Tibor to Richard Nobbs of 6/23/16, Ex. 2.D to Lovelace Sanctions Mot. [121], 87.)  The Bentleys, Lovelace, Lewis, and Nobbs all deny that Tibor "ever raised an issue about the appropriateness or legality of recording calls" before this e-mail.  (Lovelace Sanctions Mot. ¶ 15; *see also* Memorandum in Support of IPS Defs. Sanctions Mot. [130] ("IPS Defs. Supp. Sanctions Memo"), 5–9.)

Within a month, Tibor had hired an attorney to pursue a retaliatory discharge claim against Ironwood.  On July 13, 2016, Tibor's attorney, Antoinette Choate of Choate Herschman LLC, sent a letter to Ironwood outlining Tibor's claims and stating that Tibor had raised his concerns on no less than nine occasions between April 2014 and June 2016.  (Letter from Antoinette Choate to Jon Turner of 7/13/16, Ex. 6.A to Lovelace Sanctions Mot. 170–72.)  The letter did not mention the background check.  Instead, Choate asserted that Tibor's termination was the result of an "immediate[ ] retaliation" for his persistent whistleblowing, and for which

---

[3]        Tibor sent the e-mail from his work e-mail address at 11:22 AM on June 23.  It is not clear from the record whether this was before or after Ironwood notified Tibor that it was ending his employment.

Ironwood "failed to offer any reason." (*Id.* at 171.) On August 29, Choate sent Ironwood another letter, this time including a draft complaint asserting claims for common law retaliatory discharge and violations of the Illinois Whistleblower Act, 740 ILCS 174 *et seq.*, and the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.* (Letter from Antoinette Choate to Stephen Carmody of 8/29/16, Ex. 6.B to Lovelace Sanctions Mot. 175–90.) The draft complaint included print-outs of e-mails from Tibor's tenure with IPS and Ironwood in which he purportedly warned that Defendants were recording phone calls without consent and received dismissive responses from Defendants. (Exs. 6.B.1–4 to Lovelace Sanctions Mot. 192–201.) In one of the e-mails, for example, Andrew Bentley responded to a message from Tibor by saying: "Recordings? Not an issue, we can record whatever we want on this kind of call and we do not need to alert anyone about it." (E-mail from Andrew Bentley to James Tibor of 6/20/15, Ex. 6.B.1 to Lovelace Sanctions Mot. 192) In another, Dewitt Lovelace answered Tibor's request to inform call recipients that they were being recorded with a blunt "No. Do not tell them we are recording this or any other conversation." (E-mail from Dewitt Lovelace to James Tibor of 10/12/15, Ex. 6.B.2 to Lovelace Sanctions Mot. 197.)

On September 16, 2016, Ironwood finally responded to Tibor's threatened retaliatory discharge suit. In an e-mail message to Choate, Sean Allen, Ironwood's outside IT manager, informed Attorney Choate that the e-mails provided to her by Tibor had been altered. (E-mail from Sean Allen to Antoinette Choate of 9/16/16, Ex. 7.F to Lovelace Sanctions Mot. 251–52.) Allen reported that he had discovered that all of the incriminating e-mails had been written (or overwritten) on June 23, 2016—Tibor's last day in the office. In each, Tibor had altered the text of existing messages to include manufactured references to nonconsensual call recording. (*Id.*) The actual e-mails, Allen had discovered in his investigation of Ironwood's server, regarded non-controversial topics like employee scheduling. (*Id.*) In one particularly egregious fabrication, Tibor had rewritten an e-mail from April 26, 2016, in which he simply provided Lewis with directions to the Naperville call center. In its altered form, Tibor's message read:

> I continue to have concerns about process of not providing some level of alert, notice, etc. to the business owners we are calling that we are recording their conversation. I believe that we may be in violation of a few local or even state regulations if we don't notify them or have some kind of tone that they recognize as a recording. Is this something we can start incorporating in our pitch perhaps?

(Lovelace Sanctions Mot. 8) (comparing Ex. 1.A.3 to Ex. 7.D.) Lewis had responded to the original (overwritten) e-mail innocuously: "Roger[,] thanks Jim. Did computers make it?" (*Id.*) In its altered form, the purported response was: "There is no need for any notice do not make any modifications." (*Id.*)

After Allen's e-mail, Ironwood never heard from Choate again, and the threatened retaliatory discharge lawsuit was never filed. (Lovelace Decl., Ex. 1 to Lovelace Sanctions Mot. 5–6.)

Tibor's involvement with this proceeding was not made apparent until the Plaintiffs amended their original complaint. Even there, Tibor is not mentioned by name. In a hearing on March 15, 2017, just after the Plaintiffs filed the Amended Complaint, Defendants' counsel first raised the issue of Tibor's impact on the case and alluded to the facts described above. (Transcript of Proceedings on 3/15/17, Ex. 8 to IPS Defs. Supp. Sanctions Memo [130-8] ("3/15/17 Hearing Tr."), 6:16–8:16.) Plaintiffs' counsel, Jacie Zolna, admitted that Tibor was the original source of their information, but downplayed the matter. Zolna observed that because Plaintiffs had engaged in due diligence, "[i]t doesn't matter what a former employee may have done in his past or threatened lawsuits or anything like that." (*Id.* at 10:1–21.)

Lovelace and Lewis responded immediately, sending a letter to the Cherry Firm repeating their objections to the use of "the untrustworthy allegations and forged documents of James Tibor" and requesting that the Plaintiffs further amend their complaint to exclude any references to Tibor. (Letter from James Figliulo to Jacie Zolna of 4/7/17, Ex. 9 to Lovelace Sanctions Mot. 342.) This letter also satisfied Rule 11(c)(2)'s 21-day notice window before parties may properly move for sanctions. Counsel for the IPS Defendants sent a nearly

identical letter on April 26, 2017, the same day Plaintiffs filed their Responsive brief. (Letter from Jess Krannich to Jacia Zolna of 4/26/17, Ex. 9 to IPS Defs. Supp. Sanctions Memo [130-9].) Zolna responded to each letter stating:

> The draft Rule 11 motion you attached to your letter relies primarily on a series of emails you claim were fraudulent. You then make the unsupported leap that we relied on those documents to support the allegations of our Amended Complaint. You are wrong. We do not, and have never, relied on those documents you sent us to support any of our allegations.

> What you are left with is a general challenge to the credibility of Mr. Tibor. . . . [W]e did not simply take Mr. Tibor at his word, but rather conducted an independent investigation into the facts, which, as it turns out, are not in your clients' favor.

> In short, your letter and threat of Rule 11 sanctions are baseless. The facts are on our side and have been confirmed through sources other than Mr. Tibor. Simply because he may have also asserted these same *true* facts does not make them any less true.

(Letter from Jacie Zolna to James Figliulo of 4/27/17, Ex. 10 to Lovelace Sanctions Mot. ("4/27/17 Zolna Letter"), 344); Letter from Jacie Zolna to Jess Krannich of 5/9/17, Ex. 10 to IPS Defs. Supp. Sanctions Memo [130-10] ("5/9/17 Zolna Letter").)

Though Plaintiffs thus insist Tibor's credibility is not at issue with respect to the complaint, James Tibor is in fact an active participant in these proceedings: he submitted an affidavit in support of Plaintiff's Response Brief in which he rebuts several of Defendants' objections to the court's exercise of personal jurisdiction. (Tibor Decl., Ex. A to Plaintiffs' Omnibus Response to Defendants' Motions to Dismiss [116-1] ("Pls. Resp. Br."), at 1-2.) Notably, in his affidavit, Tibor does not explicitly repeat any of the core allegations involving secret recordings. (*Id.* at 3.) Nor does he mention having warned any of the Defendants, via e-mail or otherwise, that their alleged conduct was illegal. (*Id.*)

Shortly after submitting their Reply Briefs in support of the respective motions to dismiss, Lovelace and Lewis and the IPS Defendants each moved for Rule 11 sanctions.

## 4. Early Discovery by the Plaintiffs

Since this case began, Plaintiffs have filed several motions regarding the preservation of evidence. (*See* Plaintiffs' Motion for Order Requiring Defendants to Preserve Information and Cease Further Destruction of Evidence [153] ("Pls. Pres. Mot."); Plaintiffs' Motion for Spoliation Discovery [166] ("Pls. Spol. Mot.").) The court granted both of these motions based on evidence presented by Plaintiffs. (Order Granting Pls. Pres. Mot. [157]; Order Granting Pls. Spol. Mot. [172].)

After filing suit, Plaintiff began subpoenaing Veracity and IRIS, the outside vendors who stored the alleged recordings at issue in this suit. From these vendors, Plaintiffs obtained e-mail messages sent from Ironwood employees to Veracity and IRIS employees in which they discussed deleting all of the recordings and data those vendors held for Ironwood. (Pls. Pres. Mot. 2–4; Pls. Spol. Mot. 2–7.) On July 1, 2016, just one week after Tibor was fired and allegedly warned Nobbs about the illegality recorded calls, Nobbs sent an e-mail a software analyst at IRIS stating: "Is there a way to delete recorded calls on IRIS? Basically we need to delete everything from yesterday back[.]" (E-mail from Richard Nobbs to Amber Aboshihata of 7/1/16, Ex. B to Pls. Pres. Mot. [153-1].) When asked by the IRIS employee to explain why he wanted to delete the recordings, Nobbs responded "[w]e don't need you to do it now" but "[w]e may have a situation that we may need to submit a request for it and wanted to weigh options." (*Id.*)

On July 28, 2016, Plaintiffs' counsel issued an "Impending Litigation Preservation Notice" to John Turner, Ironwood's general counsel. (Pls. Pres. Mot. 3.) This notice directed Ironwood not to delete any phone call recordings or data related to its telemarketing targets. (*Id.*) Plaintiffs sent similar notices to both Veracity and IRIS. (*Id.*) After receiving the preservation notice form Plaintiffs, Turner contacted Veracity on August 16, 2017—apparently to check whether Veracity had received a notice as well. (E-mails from Jon Turner to Christian Brinton of 8/16/16 and 8/17/16, Ex. B to Pls. Spol. Mot. [166-1].) The Veracity employee

confirmed that Veracity had indeed received such a notice from Plaintiffs' counsel. (*Id.*) Turner responded the next morning to say "[c]an you direct me to the person I can speak to about this issue and the process of deleting out recordings if we elect to pursue that course of action?" (*Id.*)

On September 19, 2016, well after all the parties' preservation notices had been received, Nobbs again contacted IRIS. Nobbs requested help "deleting all the unassigned [sales] leads for the call center campaigns." (E-mail from Richard Nobbs to David Conrad of 9/19/16, Ex. F to Pls. Spol. Mot. [166-1].) Plaintiffs describe this action as "the next best thing" to deleting the recordings themselves: "After all, audio recordings are useless to the putative class without corresponding contact information." (Pls. Spol. Mot. 7.) Pursuant to this request, IRIS deleted the contact information for 2,572,688 of Ironwood's sales targets, leaving just 12,882 individual leads remaining. (*Id.*) Plaintiffs admit, however, that they were ultimately able to recover the majority of the deleted data. (*Id.* at 7–9.) In addition to the contact information, Plaintiffs claim to already possess audio recordings of calls that Ironwood made to 40,701 unique California telephone numbers. (*Id.*)

Overall, Plaintiffs argue that these circumstances reveal that "[t]he Ironwood management group appears to have arrived at a conscious plan to, at the very least, explore the destruction of evidence." (*Id.* at 6.) None of these early e-mails directly implicate Defendants Lovelace and Lewis, the owners of Ironwood, in the call recording scheme or destruction of evidence. Recent developments from the authorized spoliation discovery, however, have suggested that Lovelace and Lewis were indeed aware of—and perhaps even participated in— both the alleged secret recording scheme and Ironwood's efforts to delete data and recordings held by Veracity and IRIS. (*See* Plaintiffs' Motion Pursuant to FRCP 26(b)(5)(B) [178] ("Pls. Privilege Mot."), 3–5.)

<u>**DISCUSSION**</u>

1.    **The Defendants' Standing Objections**

    A.    **Article III Standing**

A motion to dismiss brought under Federal Rule of Civil Procedure 12(b)(1) challenges the court's subject-matter jurisdiction. The Defendants implicitly concede that Plaintiffs' putative class action meets the requirements of 28 U.S.C. § 1332(d)(2). Given the diversity of citizenship of named Plaintiffs from named Defendants, the high likelihood that the proposed class of telemarketing call recipients in California exceeds 100 members, and the near-certainty that a class of that size seeking $5,000 in statutory damages per violation would make the amount in controversy in excess of $5 million, the court is satisfied that the Plaintiffs have met that standard as well. Instead, the Defendants challenge the Plaintiffs' standing to bring this suit and argue that the Plaintiffs have not suffered an injury in fact. (*See, e.g.,* Wells Fargo Opening Br. 4–5.)

Federal courts do not have jurisdiction over a dispute unless the plaintiff has standing to challenge the alleged misconduct. *Diedrich v. Ocwen Loan Servicing, LLC*, 839 F.3d 583, 587 (7th Cir. 2016). In order to have standing, plaintiffs "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* at 587–88 (quoting *Spokeo*, 136 S. Ct. at 1547). Plaintiffs have the burden of establishing that they have standing to sue.

Plaintiffs are deemed to have suffered an injury in fact when they can show "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). "Concrete" injuries must actually exist, though they need not be "tangible." *Spokeo*, 136 S. Ct. at 1549. In regards to the second element, mere "[a]llegations of possible future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 1147 (2013).

Plaintiffs claim that they suffered two injuries as a result of the alleged non-consensual recordings: they say that the practice itself violated their privacy, and that subsequently sharing and storing the recordings on cloud-based computer systems "created a risk of data breach." (*Id.* at ¶ 108.)  Defendants argue that these "injuries" are merely technical violations and are not sufficiently concrete or particularized to give rise to standing after *Spokeo*.  (Wells Fargo Opening Br. 8.)  In *Spokeo*, the Supreme Court stated that "a plaintiff [does not] automatically satisf[y] the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right.  Article III standing requires a concrete injury even in the context of a statutory violation."  136 S. Ct. at 1549.

*Spokeo* has created difficult questions for courts faced with suits such as this one, where plaintiffs seek statutory damages without alleging actual economic loss.  *See, e.g., Meyers v. Nicolet Rest. of De Pere, LLC*, 843 F.3d 724, 727 (7th Cir. 2016) (holding that plaintiff who alleged that defendant failed to truncate his credit card's expiration date on a receipt lacked standing to sue under the Fair and Accurate Credit Transactions Act).  The Supreme Court recognized that statutory rights are enforceable, however, and reaffirmed that legislatures "may elevate to the status of legally-cognizable injuries concrete, *de facto* injuries that were previously inadequate in law."  *Id.* (quoting *Lujan*, 504 at 578).  When determining whether an intangible injury based on the violation of a statutory right gives rise to Article III standing, *Spokeo* instructs courts to consider historical practice and legislative judgment.  *Id.*  If an alleged intangible harm bears a close resemblance to a harm traditionally regarded as conferring standing under common law, the harm is likely concrete.  *Id.*  Furthermore, plaintiffs must show that the alleged violation "presented an 'appreciable risk of harm' to the underlying interest that Congress sought to protect by enacting the statute."  *Groshek v. Time Warner Cable, Inc.*, 865 F.3d 884, 887 (7th Cir. 2017).  In these situations, the harm arising from a defendant's violation of a stature may suffice to create standing, and "a plaintiff in such a case need not allege any additional harm beyond the one Congress has identified."  Spokeo, 136 S. Ct at 1549–50 (citing

*FEC v. Akins*, 524 U.S. 11, 20–25 (1998) and *Public Citizen v. Department of Justice*, 491 U.S. 440, 449 (1989) for the proposition that not receiving statutorily-required disclosures of information can give rise to standing).

In this light, the court concludes that Plaintiffs have suffered a sufficiently concrete injury by alleging a violation of their right to privacy. Invasion of privacy is actionable at common law, *see* Restatement (Second) of Torts § 652A (Am. Law Inst. 1977), and the type of injury alleged here arises from the exact same type of violation that CIPA prohibits: recording telephone communications without consent. *See* Cal. Penal Code § 630 (declaring the Legislature's intent to "protect the right of privacy of the people of [California]" from the threat posed by "the continual and increasing use of [eavesdropping] devices and techniques"). It is also telling, though not dispositive, that CIPA gives injured persons the right to sue for either statutory damages or triple the amount of actual damages sustained. Cal. Penal Code § 637.2. The same provision explicitly states that "[i]t is not a necessary prerequisite to an action pursuant to this section that the plaintiff has suffered, or be threatened with, actual damages." *Id.*

The California District Courts that have interpreted CIPA in the wake of *Spokeo* have all held that CIPA violations constitute injuries in fact even without a showing of any actual harm beyond the invasion of the plaintiff's right to privacy. In *Matera v. Google Inc.*, No. 15-CV-4062-LHK, 2016 WL 5339806 (N.D. Cal. Sept. 23, 2016), the district court conducted a lengthy analysis of CIPA before concluding that "alleged violations of Plaintiff's statutory rights under the Wiretap Act and CIPA constitute concrete injury in fact." *Id.* at *8–14. *See also Romero v. Securus Technologies, Inc.*, 216 F. Supp. 3d 1078, 1087–89 (S.D. Cal. 2016) (adopting the court's reasoning in *Matera*); *Raffin v. Medicredit, Inc.*, No. CV 15-4912-GHK (PJWx), 2016 WL 7743504, at *2–3 (C.D. Cal. Dec. 19, 2016) (same). The judge distinguished the plaintiff's CIPA suit from the "bare procedural violation" in *Spokeo*, reasoning that CIPA established an enforceable, substantive right "intended to 'accord every citizen's privacy the utmost sanctity' and 'provide those who suffer an infringement of their personal liberty a means of vindicat[ion].'"

*Id.* at \*10, \*13 (quoting *Ribas v. Clark*, 38 Cal. 3d 355, 365 (1985)). In *Bona Fide Conglomerate, Inc. v. SourceAmerica*, No. 3:14-cv-751-GPC-DHB, 2016 WL 3543699 (S.D. Cal. June 29, 2016), another district court extended the same conclusion to a business suing under CIPA, finding that it had standing to sue over secret recordings the defendants had made of the business's employees. *Id.* at \*7–8.

This court concludes that Plaintiffs' alleged injury caused by the alleged violation of privacy constitutes an injury in fact, and that the Plaintiffs have standing to sue. The court notes, however, that this conclusion extends only to the alleged violation of privacy, not to the Plaintiffs' alternate theory that the Defendants' "practice of storing the recordings in cloud-based computer systems accessible by the internet created a risk of data breach." (Am. Compl. ¶ 108.) The Supreme Court has explicitly denied that plaintiffs have standing based on such risks because it "relies on a highly attenuated chain of possibilities [and] does not satisfy the requirement that threatening injury must be certainly impending." *Clapper*, 568 U.S. at 410, 414–17; *see also In re Lenovo Adware Litig.*, No. No. 15-md-2624-RMW, 2016 WL 6277245, at \*4 (N.D. Cal. Oct. 27, 2016) (recognizing standing to assert claims "based on the alleged privacy and performance problems," but not claims under CIPA alleging that defendants' software had "exposed [plaintiffs'] laptops and information to potential security breaches").

### B.     "Statutory Standing"

The Defendants also join together to assert that the Plaintiffs, as businesses, lack "statutory standing" to sue for relief under CIPA. (*See, e.g.*, Wells Fargo Opening Br. 6; IPS Defs. Opening Br. 6–10.) They assert that businesses do not have personal privacy rights that others can violate, and therefore cannot sue for relief under CIPA. (*Id.*) The term "statutory standing," is disfavored by the Supreme Court, and Defendants' argument is really just an objection under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted. *See Lexmark Int'l, Inc. v. Static Control Components Inc.*, 134 S. Ct. 1377, 1387 n.4 (2014); *Woodman's Food Market, Inc. v. Clorox Co.*, 833 F.3d 743, 750 (7th Cir.

2016) ("[T]he question of who is authorized to bring an action under a statute is one of statutory interpretation; it does not implicate Article III standing or jurisdiction.").

Defendants argue that "to assert a claim under [ ] CIPA, the plaintiff must assert a violation of some privacy right of an *individual.*" (Wells Fargo Opening Br. 6) (emphasis in original). Citing to California law, Defendants claim that "businesses have no personal right of privacy." (IPS Defs. Opening Br. 7) (quoting *Fibreboard Corp. v. Hartford Accident & Indemnity Co.,* 16 Cal. App. 4th 492, 516, 20 Cal. Rptr. 2d 376, 391 (1st Dist. 1993). As Defendants acknowledge, some California courts have found that businesses may have some "lesser right to privacy" in certain situations, contingent upon "the strength of the nexus between the artificial entity and human beings and the context in which the controversy arises." *Roberts v. Gulf Oil Corp.*, 147 Cal. App. 3d 770, 797, 195 Cal. Rptr. 393, 411 (5th Dist. 1983); *see also H & M Assoc. v. City of El Centro,* 109 Cal. App. 3d 399, 410, 167 Cal. Rptr. 392, 399 (4th Dist. 1980) (denying that a plaintiff-business could "seek damages for hurt feelings because of 'its' right to be left alone"). But Defendants deny that these factors exist in Plaintiffs' case because the "routine [and] introductory telemarketing call[s]" related solely to business operations and did not impact the personal privacy interests of real people—that is, the Plaintiffs' owners. (IPS Defs. Opening Br. 8.)

In the court's view, this argument misses the point. Plaintiffs are suing under CIPA, not the common law of California. "Although a corporation may not pursue a common law action for invasion of privacy, it may bring an action for violation of the Privacy Act." *Coulter v. Bank of America,* 28 Cal. App. 4th 923, 930, 33 Cal. Rptr. 2d 766, 771 (4th Dist. 1994) (citing *Ion Equipment Corp. v. Nelson*, 110 Cal. App. 3d 868, 879–80, 168 Cal. Rptr. 361, 366–67 (1st Dist. 1980)). Section 632 of CIPA explicitly states that corporations, partnerships, and other legal entities are "persons" who may be held liable for surreptitiously recording confidential communications. Cal. Penal Code § 632(b). CIPA's remaining sections do not define the term "person" at all, but this court sees no reason to conclude that the definition of the term that

applies to perpetrators of CIPA offenses should not also apply to the victims. *See Ion Equipment*, 110 Cal. App. 3d at 879–80, 168 Cal. Rptr. at 366–67. ("The purpose of the Invasion of Privacy chapter is to deter wrongful conduct. That purpose could be easily circumvented if it were not an offense to eavesdrop upon or record confidential communications of corporations.") Even after *Spokeo*, every court that has addressed this question has held that businesses may sue for relief under CIPA. *See, e.g., Fed. Univ. Police Officers' Ass'n v. Regents of Univ. of California*, No. SACV 15-137-JLS (RNBx), 2015 WL 13273308, at *4 (C.D. Cal. July 29, 2015); *Bona Fide*, 2016 WL 3543699, at *6.

Defendants attempt to distinguish this uniform line of cases from the Plaintiffs' situation by asserting that, in each case, the business had suffered economic harm or was suing on behalf of its injured employees. (IPS Defs. Reply Br. 12–15.) Their efforts are not convincing. The case law clearly establishes that the violation itself is enough, regardless of whether the aggrieved party is an individual or a business. In addition, the Defendants' argument here simply restates their position in regards to Article III standing. This court (and many others) has already determined that parties who suffer offenses prohibited by CIPA do not need to allege harm beyond the violation of their statutory rights in order to have suffered a concrete injury.

**2.    Objections Based on the Failure to Allege Conduct Prohibited by CIPA**

Defendants have all joined in asserting several further objections to Plaintiffs' Amended Complaint. Defendants that Plaintiffs have not alleged conduct prohibited by either CIPA Section 632 or 632.7, and therefore seek dismissal of all counts based on FED. R. CIV. P. 12(b)(6). (*See, e.g.,* Ironwood Opening Br. 2.)

To survive a motion to dismiss under Rule 12(b)(6), "a plaintiff must allege 'enough facts to state a claim to relief that is plausible on its face.'" *Forgue v. City of Chicago*, 873 F.3d 962, 966 (7th Cir. 2017) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). When applying this standard, the court "accept[s] as true all well-pleaded facts in the complaint as true

and draw[s] all reasonable inferences in favor of the plaintiff." *Id.* (internal citation and quotation marks omitted).

### A. Failure to allege that the § 632 calls were "confidential"

Section 632 of CIPA only prohibits the nonconsensual recording of "confidential" communications. The statute defines a confidential communication as "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties." Cal. Penal Code § 632(c). This is an objective standard. *Flanagan v. Flanagan*, 27 Cal. 4th 766, 776–77, 41 P.3d 575, 582 (2001). "[A] conversation is confidential under section 632 if a party to that conversation has an objectively reasonable expectation that the conversation is not being overheard or recorded." *Id.*

Plaintiffs note three circumstances that would create an objectively reasonable expectation that the calls would not be recorded: They argue that Defendants' practice of "Caller ID Spoofing" made Plaintiffs think they were receiving calls from local customers not likely to record their conversations, that the subject matter of the calls regarded "sensitive and confidential" business matters, and, most importantly, that Defendants never warned them that the calls would be recorded. (Am. Compl. ¶¶ 60–69.) Ultimately, only the last of these three factors matters.

Addressing the Plaintiffs' first supporting fact in brief, the court is not convinced that "Caller ID Spoofing" has the effect that Plaintiffs claim. Courts in this district may have found the practice deceptive and invasive, *see Varnado v. Midland Funding LLC*, 43 F. Supp. 3d 985, 992 (N.D. Ill. 2014), but a spoofed phone number showing a local area code would hardly lead the recipient to expect that a call would any more or less likely to be recorded than one from an out-of-state number, or from a customer as opposed to anyone else. Surely there are plenty of telemarketing firms that could use their legitimate, un-spoofed phone numbers to make calls to recipients within their same area code and accomplish the same result. Generally speaking, a spoofed number may make the recipient more likely to answer the phone, but the infererence

that spoofing "induce[s] a merchant's reasonable expectation that he or she . . . is not reasonably likely to be recorded" does not logically follow from Plaintiffs' allegations. (*See* Am. Compl. ¶ 65.)

Defendants focus in large part on the content of the calls, which the Plaintiffs allege to have included requests for the "business's monthly or annual credit and debit card sales volume." (*Id.* at ¶ 66.) Defendants suggest that such information "is not inherently confidential," and that, even if it were, the Plaintiffs only allege that they were *asked* to provide their sales volumes and processing methods—not that they actually disclosed that information. (IPS Defs. Opening Br. 16.) Plaintiffs respond that the content of a communication does not matter for the purposes of establishing an objectively reasonable expectation of privacy, but argue that the topics discussed were sufficiently sensitive anyway. (Pls. Resp. Br. 9–10.) The court takes no position on the Plaintiffs' latter statement, as it concludes that the content of a communication does not typically matter under CIPA.

The California Supreme Court has emphasized that courts should focus on the *context* of the conversation, not the content. *See Flanagan*, 27 Cal. 4th at 776, 41 P.3d at 581–82 ("[Section 632] protects against intentional, nonconsensual recording of telephone conversations regardless of the content of the conversation"); *Kearney v. Solomon Smith Barney, Inc.*, 39 Cal. 4th 95, 117 n.7, 137 P.3d 914, 929 n.7 (2006). Courts look to several factors in determining whether the circumstances of a communication give rise to an objectively reasonable expectation of privacy, including: whether the call was initiated by the recording party or the recorded party, the duration and nature of the parties' relationship, the recorded party's prior experiences with business communications, whether the conversation could be easily overheard with the naked ear, and the nature and timing of any warnings or disclosures by the recording party. *See Kight v. CashCall, Inc.*, 200 Cal. App. 4th 1377, 1396, 133 Cal. Rptr. 3d 450, 462 (4th Dist. 2011); *Reynolds v. City and Cty. of San Francisco*, No. C 09-301 RS, 2012 WL 1143830, at *5 (N.D. Cal. Mar. 30, 2012). Of these factors, whether or not the

recording party informed the other parties to the conversation appears to be by far the most important. *See Kearney*, 39 Cal. 4th at 118, 137 P.3d at 930; *Raffin*, 2017 WL 131745 at * 9 ("We conclude that [CIPA] prohibits a defendant from recording a telephone conversation without first informing the parties to the conversation that the conversation is being recorded.")

Plaintiffs allege that no such warning was given here. They allege that the Defendants' standard telemarketing script did not contain a warning, and that they never personally received one. This is enough to state a claim under section 632. Defendants cite to cases that suggest that a warning is merely sufficient, not strictly necessary, to establish an objectively reasonable expectation that a given conversation is not being recorded, but most of those cases involve calls where the recorded party had received a prior warning or had given prior consent which the courts found to carry over to future communications. *See Shin v. Digi-Key Corp.*, No. CV 12-5415 PA (JCGx), 2012 WL 5503847, *1–3 (C.D. Cal. Sept. 17, 2012); *Hataishi v. First Am. Home Buyers Prot. Corp.*, 223 Cal. App. 4th 1454, 1467–68, 168 Cal. Rptr. 3d 262, 272–73 (2d Dist. 2014); *Maghen v. Quicken Loans Inc.*, 94 F. Supp. 3d 1141, 1146 (C. D. Cal. 2015). Defendants also argue that the Plaintiffs' phone conversations could have been overheard by third parties standing nearby—which would eliminate any reasonable expectation of privacy with respect to the call. (*See* Ironwood Opening Br. 5–7) (citing *Reynolds*, 2012 WL 1143830 at *5–6 (holding that a police officer could not reasonably expect his telephone conversation to remain private from his coworkers when he was speaking loudly in a shared office space)). But this is mere speculation. Nothing in Plaintiffs' allegations suggests that Plaintiffs should have or would have expected to be recorded or overheard by anyone. The court concludes that, at the very least, the baseline assumption in situations where the recorded party does not initiate the call, does not have a prior relationship with the caller, and does not receive a warning at the outset of the call, is that it is reasonable for a party to expect that its conversation is not being recorded. *See, e.g., Kearney*, 39 Cal. 4th at 118, 137 P.3d at 930. *See also, e.g.*, *Roberts v. Wyndham International, Inc.*, No. 12–CV–5180–PSG, 2012 WL 6001459, at *5 (N.D. Cal. Nov. 30, 2012);

*Branca v. Ocwen Loan Servicing, LLC*, No. CV 13-7502 BRO (Ex), 2013 WL 12120261, at *12–13 (C.D. Cal. Dec. 27, 2013).

Finally, Defendant Ironwood claims that "CIPA does not apply to business-related calls." (Ironwood Opening Br. 5.) The case law flatly contradicts this assertion. Again and again, courts have extended the protections of CIPA to business-related communications. *See Frio v. Superior Court*, 203 Cal. App. 3d 1480, 1489, 250 Cal. Rptr. 819, 823 (2d Dist. 1988) (rejecting petitioner's argument that "business communications lack confidentiality" as a matter of law); *Kight*, 200 Cal. App. 4th at 1391, 133 Cal. Rptr. 3d at 458 ("The statute [ ] contains no exceptions applicable when a business monitors a telephone conversation even if the monitoring is for a legitimate business purpose."). Ironwood cites the Ninth Circuit's opinion in *Med. Lab. Mgmt. Consultants v. American Broadcasting Companies, Inc.*, 306 F.3d 806 (9th Cir. 2002), to argue that business-related conversations are "not sufficiently private and personal in character to make any privacy expectation reasonable." *Id.* at 817. That case, however, involved Arizona common law, not CIPA, and does not control the outcome here. *See id.* at 815. All of the courts that have examined claims for relief under CIPA have either distinguished *Medical Laboratory* as not applicable to a party's reasonable expectation of privacy under CIPA, *see Vera v. O'Keefe*, 791 F. Supp. 2d 959, 967 (S.D. Cal. 2011); *In re Facebook Internet Tracking Litig.*, 140 F. Supp. 3d 922, 933–34 (N.D. Cal. 2015), or, more commonly, failed to discuss it at all.

The other cases cited by Ironwood do not establish a bright-line rule for business communications either; instead, they address a "servicing observing" exception to non-consensual recordings during routine calls placed to customer service providers—which some courts read into Section 632 based on their interpretations of CIPA's legislative history. *See Shin*, 2012 WL 5503847, at *3; *Sajfr v. BBG Communications, Inc.*, No. 10cv2341 AJB (NLS), 2012 WL 398991, at *6 (S.D. Cal. Jan. 10, 2012). Subsequent decisions by California state appellate courts and multiple federal district courts have rejected the existence of such an

exception. *See, e.g., Kight*, 200 Cal. App. 4th at 1394–95, 133 Cal. Rptr. 3d at 461; *Knell v. FIA Card Services, N.A.*, No. 12-cv-0426-AJB (WVG), 2013 WL 12121237, at *7 (S.D. Cal. Feb. 21, 2013) (implicitly overruling the same judge's earlier *Sajfr* opinion and stating that "Section 632 does not create a 'service-observing' exemption in its unambiguous provisions and, thus, the Court declines to create one based upon the statute's legislative history"); *Ades v. Omni Hotels Mgmt. Corp.*, 46 F. Supp. 3d 999, 1007–08 (C.D. Cal. 2014) (same). This court also declines to look into CIPA's legislative history when the text of Section 632 clearly covers the behavior described in Plaintiffs' Amended Complaint.

## B. Failure to allege that the § 632.7 calls involved the required equipment

The Defendants' final joint argument involves the Plaintiffs' claims under section 632.7. Unlike section 632 which only applies to 'confidential communications," section 632.7 prohibits the nonconsensual recording of *any* communication, so long as the communication was "transmitted between two cellular radio telephones, a cellular radio telephone and a landline telephone, two cordless telephones, a cordless telephone and a landline telephone, or a cordless telephone and a cellular radio telephone." Cal. Penal Code § 632.7(a). The Amended Complaint alleges that three of the four named Plaintiffs received telemarketing calls from Defendants on a cellular or cordless telephone. (Am. Compl. ¶¶ 34–36.) Plaintiffs do not state what type of phone the Defendants used to *make* the calls, however. Defendants argue that this failure is fatal to Plaintiffs' claims under section 632.7: "[o]n its face, the statute is violated only if specific means of communication are used on both ends of the call." (IPS Defs. Opening Br. 19.)

This court declines to dismiss the complaint on this basis. In *Flanagan v. Flanagan*, 27 Cal. 4th 766, 41 P.3d 575 (2002), the California Supreme Court stated that section 632.7 covers any "intentional interception or recording of a communication involving *a* cellular phone or a cordless phone." 27 Cal. 4th at 776, 41 P.3d at 581 (emphasis added). As later district courts have recognized, the California Supreme Court's remark appears to be *dicta*, as *Flanagan* did

not require it to interpret section 632.7. *See Montantes v. Inventure Foods*, No. CV–14–1128–MWF (RZx), 2014 WL 3305578, at *5 (C.D. Cal. July 2, 2014). It is thus still not clear whether a plaintiff must actually prove the identity of both devices in order to prevail on a claim for relief under section 632.7. *Compare Kamberian v. Charles Schwab & Co.*, No. CGC-12-518383, 2015 Cal. Super. LEXIS 7104, at *13 (Super. Ct. Nov. 23, 2015) (stating that plaintiffs must establish the identity of both devices, but leaving the matter unresolved by granting summary judgment for defendant on other grounds), *with Roberts*, 2012 WL 6001459, at *4 ("[A] communication involving at least one cellular phone [ ] satisfies the California Supreme Court's interpretation of Section 632.7.") Regardless of this ongoing confusion, however, it does not apply to bar a plaintiff's claim for relief at the dismissal stage of litigation. *See Montantes*, 2014 WL 3305578 at *7 (denying the defendant's motion to dismiss and leaving the question of the other device used for resolution on summary judgment). So far, no court has dismissed a suit for violations of section 632.7 based on the plaintiff's failure to allege the type of telephone used by the defendant. *See, e.g., id.*; *Roberts*, 2012 WL 6001459, at *4–5; *Kahn v. Outrigger Enterprises, Inc.*, No. 2:13–cv–03802–SVW–JCx, 2013 WL 12136379, at *7 (C.D. Cal. Oct. 29, 2013); *McCabe v. Six Continents Hotels, Inc.*, No. 12-CV-04818 NC, 2014 WL 465750, at *4 (N.D. Cal. Feb. 3, 2014). This court will not be the first. Plaintiffs allege that they received the telemarketing calls on cellular and cordless phones; it is entirely plausible that the calls originate from another cell phone, a cordless phone, or a landline phone—as the statute requires.

At first glance, Defendants' argument appears frivolous: there are only so many types of telephones, and the language of section 632.7 covers all of the obvious options. Here, however, the Defendants suggest—though do not outright state—that they may have used "Voice over Internet Protocol" ("VoIP") to make the calls. (*See* IPS Defs. Opening Br. 20 n.10.) VoIP is a method of making telephone calls using a broadband internet connection rather than traditional phone lines. (*See id.*) (citing 47 C.F.R. § 9.3). The phrase "VoIP" does not appear in the text of section 632.7, and Defendants suggest that this leeway renders Plaintiffs' claims for

relief implausible. (IPS Defs. Reply Br. 11.) Plaintiffs respond that Defendants' "myopic argument fails because a broadband VoIP line is literally a *landline*—the signal travels over a physical broadband cable in the ground—which is exactly what § 632.7 covers." (Pls. Resp. Br. 24) (emphasis in original).

By claiming that calls sent using VoIP are beyond the scope of section 632.7, the Defendants are in good company. Numerous other telemarketers faced with actions under section 632.7 have advanced the same argument in their motions to dismiss, with little success. So far, no court has decided the underlying legal issue one way or the other. *See, e.g., Kamberian*, 2015 Cal. Super. LEXIS 7104 at *19 (discussing whether the term "landline" in section 632.7 includes VoIP, but "leav[ing] the matter unresolved"). The parties here cite to opposing authority to claim that the California Supreme Court will inevitably adopt their respective positions on VoIP. But the role played by VoIP in this case—if any—is irrelevant for the purposes of the present motions to dismiss. *Roberts*, 2012 WL 6001459 at *4; *Montantes*, 2014 WL 3305578 at *7. Plaintiffs have alleged that they received the calls on devices covered by section 632.7. That is enough for now.

3. **Defendant-specific Arguments**

Finally, the Defendants advance many arguments unique to their specific circumstances. Even assuming that the Amended Complaint does allege conduct prohibited by CIPA, these Defendants argue, they are not liable. In general, these Defendants all either object to the court's exercise of personal jurisdiction over them under FED. R. CIV. P. 12(b)(2), or argue under FED. R. CIV. P 12(b)(6) that the Amended Complaint fails to state claim against them. Some Defendants make both arguments.

A. **The IPS Defendants**

Plaintiffs must demonstrate that the court has personal jurisdiction over each defendant. *Calder v. Jones*, 465 U.S. 783, 790 (1984). The court resolves factual disputes in favor of jurisdiction. *N. Grain Mktg., LLC v. Greving*, 743 F.3d 487, 491 (7th Cir. 2014). Personal

jurisdiction may be general or specific. *Id.* at 492. The IPS Defendants assert that neither form of personal jurisdiction exists over them for Plaintiffs' claims. (IPS Defs. Opening Br. 11.)

The parties disagree as to whether general personal jurisdiction exists, but this point is not in serious dispute. IPS is a Nevada corporation headquartered in Nevada. The Bentleys are all domiciled in Utah and claim they have never lived in Illinois. (*See* Brian Bentley Decl. 2, Ex. 1 to IPS Defs. Opening Br. [110-1].) Plaintiffs have presented evidence that Defendant Brian Bentley once leased a condominium in Chicago across the street from IPS's call center (*see* Jessica Chavin Decl. 1–2, Ex. B to Pls. Resp. Br. [116-2]), but this is not dispositive. Brian Bentley admits that the condominium was leased in his name, but explains that it was paid for by IPS's corporate funds and only used for business purposes, not as a residence. (Second Brian Bentley Decl. 2, Ex. 1 to IPS Defs. Reply Br. [128-1].) Plaintiffs have presented no evidence that any of the Bentleys were domiciled in Illinois, or that they used the condo for anything other than short stays during business trips. Overall, although the IPS Defendants operated telemarketing call centers in Illinois and traveled to Illinois on business, they are clearly not "at home" in Illinois such that they could anticipate being haled into court on actions unrelated to their contacts with the state. *Id.*; *see also Daimler AG v. Bauman*, 134 S. Ct. 746, 761 (2014).

Specific personal jurisdiction requires a showing that the defendant's contacts with the forum state "directly relate to the challenged conduct or transaction." *Tamburo v. Dworkin*, 601 F.3d 693, 702 (7th Cir. 2010). Specific jurisdiction in federal court is predicated on the jurisdictional authority of the state in which it sits—in this case, Illinois. *See N. Grain Mktg.*, 743 F.3d at 491. Illinois' long-arm statute permits its courts to exercise jurisdiction as far the Constitution of the United States allows, *see* 735 ILCS 5/2-209(c), merging the constitutional and statutory questions. The exercise of specific personal jurisdiction is appropriate when "(1) the defendant has purposefully directed his activities at the forum state or purposefully availed

himself of the privilege of conducting business in that state, and (2) the alleged injury arises out of the defendant's forum-related activities." *Tamburo*, 601 F.3d at 702.

Defendants argue that specific personal jurisdiction does not exist because the alleged activities (the telemarketing calls) were not "expressly aimed at" Illinois. (IPS Defs. Opening Br. 14) (quoting *Calder*, 465 U.S. at 789). But this argument ignores the second half of the Seventh Circuit's test in *Tamburo v. Dworkin*, 601 F.3d 693 (7th Cir. 2010). That case explains that specific jurisdiction exists for an alleged injury when a defendant *either* "purposefully direct[s] his activities at the forum state" *or* "purposefully avail[s] himself of the privilege of conducting business in [the forum] state." *Id.* at 702. The "expressly aimed at" language in *Calder v. Jones*, 465 U.S. 783 (1984) is non-limiting; *Calder* concluded that Californian victims of torts "expressly aimed at" California *could* sue in California, not that they could *only* sue there. *Id.* at 789–90. The *Calder* Court explicitly recognized that the plaintiffs in *Calder* could have sued in Florida—the state the tortious actions were aimed from—if they desired. *Id.* at 790; *see also Tamburo*, 601 F.3d at 709 ("Tamburo could have sued the individual defendants in their home jurisdictions").

Defendants in this case cannot dispute that they purposefully availed themselves of the privilege of conducting business in Illinois, or that the alleged injury arose out of their Illinois activities. In the case of IPS, the secretly recorded calls at issue in this case were made from its Chicago and Naperville call centers. Plaintiffs have adequately established that personal jurisdiction exists over the Bentleys as individuals as well. Plaintiffs alleged that the Bentleys traveled to Illinois on multiple occasions, where they "devised and implemented" the secret recording scheme, engaged Veracity for data-storage services, and directed IPS employees to follow through on their plan in the face of multiple warnings by IPS employees that their conduct was illegal.[4] (Am. Compl. ¶¶ 74–77.) Business travel to Illinois has long been "considered an

---

[4] Plaintiffs' allegations against the Bentleys as individuals are similar to, though slightly more detailed than, those leveled at Lovelace and Lewis. Unlike Lovelace and Lewis,

activity that "invokes the benefits and protections" of Illinois law." *Torco Oil Co. v. Innovative Thermal Corp.*, 730 F. Supp. 126, 134 (N.D. Ill. 1989) (citing *Jacobs/Kahan & Co. v. Marsh*, 740 F.2d 587, 592 (7th Cir. 1984); *Deluxe Ice Cream Co. v. R.C.H. Tool Corp.*, 726 F.2d 1209, 1213 (7th Cir. 1984)). Courts in this district have held that even one visit may be sufficient when the cause of action arises out of the visit. *See, e.g., Olson v. Jenkens & Gilchrist*, 461 F. Supp. 2d 710, 724 (N.D. Ill. 2006); *Vandeveld v. Christoph*, 877 F. Supp. 1160, 1165 (N.D. Ill. 1995); *Hyatt Int'l Corp. v. Inversiones Los Jabillos*, C.A., 558 F. Supp. 932, 934–35 (N.D. Ill. 1982).

### B. Lovelace and Lewis

Ironwood's owners Dewitt Lovelace and John Lewis moved to dismiss the Plaintiffs' claims against them under FED. R. CIV. P. 12(b)(2) for lack of personal jurisdiction and under FED. R. CIV. P 12(b)(6) for failing to state claims upon which relief can be granted. (Lovelace Opening Br. 2.) Lovelace and Lewis argue that, as non-residents, they lack the minimum contacts required to subject them to personal jurisdiction in Illinois, and dispute the Plaintiffs' claims that the alleged injury arises out of their forum-related activities. (*Id.*) Lovelace and Lewis also argue that the claims against them should be dismissed "because no reasonable inference can be drawn that [they] made any so-called 'secret' recordings" from Plaintiffs' "threadbare and conclusory allegations." (*Id.*)

For either objection, the ultimate question is the same: what does the Amended Complaint allege that Lovelace and Lewis did to subject themselves to liability? In both instances, the court concludes that the Plaintiffs have alleged sufficient facts. Accordingly, the court denies their motion to dismiss.

---

however, the Bentleys did not object to Plaintiffs' allegations under FED. R. CIV. P. 12(b)(6) as conclusory or insufficient to hold them personally liable. (*See* Pls. Resp. Br. 41) (discussing the differences between the Bentleys' motion to dismiss and that of Lovelace and Lewis). Although this court has serious reservations regarding the factual basis for some of the allegations in the Amended Complaint, the court must accept them as true for the purposes of the present motions. As a result, the court finds that personal jurisdiction exists over the Bentleys based on these allegations.

In regard to the Defendants' jurisdictional arguments, this court finds them unconvincing for the same reasons stated in denying the IPS Defendants' motion to dismiss—though it is a much closer call. Defendant Ironwood does not contest the court's personal jurisdiction, but "jurisdiction over an employee does not automatically follow from jurisdiction over the corporation which employs him." *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 781 n.13 (1984); *see also Central States, Se. & Sw. Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 943 (7th Cir. 2003) (extending *Keeton* to corporate affiliation and stock ownership). In this case, however, the alleged activities—business trips during which they allegedly ordered employees to secretly record phone calls and installed a new computer system to facilitate those calls—occurred in Illinois, and the Plaintiffs' cause of action is related to those activities. (Am. Compl. ¶¶ 94–96.)

"Plaintiff[s] must allege 'enough facts to state a claim to relief that is plausible on its face.'" *Forgue v. City of Chicago*, 873 F.3d 962, 966 (7th Cir. 2017) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). When weighing a motion to dismiss, courts accept all well-pleaded facts as true and resolve all reasonable inferences in the plaintiff's favor. *Id.* Plaintiffs need not plead detailed factual allegations in order to survive a motion to dismiss, but they must nevertheless "provide more than mere labels and conclusions or a formulaic recitation of the elements of a cause of action." *Bell v. City of Chicago*, 835 F.3d 736, 738 (7th Cir. 2016) (internal citation and quotation marks omitted).

Plaintiffs' case against Lovelace and Lewis rests on three core allegations: (1) that they "direct[ed] employees to secretly record phone calls to California businesses" during in-person meetings, and over telephone calls, e-mails, and text messages; (2) that they ignored warnings from an employee that their recording scheme was illegal, and later fired him for continuing to speak out; and (3) that they "knowingly expanded and refined the system of illegally recording phone calls to California merchants" by implementing a new computer system provided by IRIS (the "IRIS CRM system"). (Am. Compl. ¶¶ 94–96.) The first two of these allegations are sparse

and offer little in the way of detail to show that the Plaintiffs are entitled to relief. *See Ashcroft v. Iqbal*, 556 U.S. 662, 667–68 (2009) ("[T]he pleading standard Rule 8 announces does not require detailed factual allegations, but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation.") (internal citation and quotation marks omitted). The second point, the alleged termination of a dissenting employee, is particularly questionable given the evidence available thus far which suggests James Tibor was not fired for that reason.

Normally, the court would expect Plaintiffs to be able to provide more detail as to what Lovelace and Lewis said, when they said it, and to whom who they said it. *See Olson v. Champaign County,* 784 F.3d 1093, 1100 (7th Cir. 2015) ("Plaintiffs' 'pleading burden should be commensurate with the amount of information available to them.'") (quoting *Bausch v. Stryker Corp.*, 630 F.3d 546, 561 (7th Cir. 2010)). Courts do not hold litigants to a requirement of presenting information they could not be expected to have at the outset of litigation, but Plaintiffs here claim to be relying on Tibor's word, at least in part. That said, recent revelations from Plaintiffs' spoliation discovery suggest that Plaintiffs' first allegation—that Lovelace and Lewis personally ordered employees to record all of the phone calls they placed—has substantial factual support. (*See generally* Pls. Spol. Mot.; Pls. Privilege Mot.) (discussing e-mails sent by Ironwood's employees and attorneys regarding the destruction of evidence).

The strongest allegations levels against Lovelace and Lewis, however, involve their efforts to implement the IRIS CRM system at the Naperville call center. Plaintiffs recognize as much, and their brief focuses in large part on this third allegation. (*See* Pls. Resp. Br. 39.) Plaintiffs cite an affidavit from James Tibor in which he states that Lovelace and Lewis visited the Naperville call center for the express purpose of implementing the IRIS CRM system. (Tibor Decl. ¶¶ 13, 14, Ex. A to Pls. Resp. Br [116-1].) Defendants argue that Plaintiffs draw an erroneous inference of connection between the alleged retention of IRIS to provide data services and violations of CIPA: "the hiring of such a firm says *nothing* about how and when any recording would be accomplished. Even Plaintiffs recognize that the issue under § 632 and

§ 632.7 is not 'recording,' but rather 'secret recording' or recording without consent." (Lovelace Opening Br. 7) (emphasis in original). This, however, misstates the Plaintiffs' allegations. Plaintiffs assert that the IRIS CRM system itself "automatically recorded all calls made from the Naperville call center." (*See* Tibor Decl. ¶ 11.) Afterwards, Lovelace and Lewis directed Ironwood employees to use the new IRIS CRM system and make calls using the standard telemarketing scripts—which, as Plaintiffs have repeatedly stated, did not include a warning or request for permission. (Pls. Resp. Br. 39) (citing Am. Compl. ¶¶ 1, 11, 16, 17, 20, 69, 74, 75, 77, 78, 81, 82, 89, 90, 94, 99, 100, 102, 104, 155, 191, 227, 239, 275.) Plaintiffs argue that "the reasonable inference follows that when Lewis and Lovelace instructed employees to record calls, they were instructing them to record calls without warning." (*Id.* at 39–40.) The court agrees that Plaintiffs' inference is a reasonable one, and states a plausible claim for relief against Lovelace and Lewis as individuals. *See Forgue,* 873 F.3d at 960 (holding that the plaintiff had drawn a reasonable inference that the Chicago Police Department had violated his property interests when the CPD failed to observe its well-established, though unwritten, custom of granting retiring employees certain benefits).

Defendants Lovelace and Lewis argue that Plaintiffs overstate their involvement in the daily operations of Ironwood's call centers, and submit affidavits in which they claim that they had no supervisory or managerial responsibilities over Ironwood's employees and that they only visited the call centers "two or three times" from their homes in Mississippi. (Lovelace Decl. 1–2, Ex. 1 to Lovelace Opening Br. [99-1]; Lewis Decl. 1, Ex. 2 to Lovelace Opening Br. [99-2].) Given the nature of their visits, however, and the alleged importance of their directives to the overall operation of the call center, the court is satisfied that Plaintiffs have pleaded sufficient facts to hold Lovelace and Lewis liable. Assuming what Plaintiffs claim is true, Lovelace and Lewis necessarily violated CIPA during the course of their direct oversight of the IRIS CRM implementation. Plaintiffs remaining allegations simply underline the point: if Lovelace and

Lewis truly ordered employees to secretly record calls placed to Californian businesses, then they are clearly liable when their employees did so.

Overall, Plaintiffs' claims against Lovelace and Lewis are far more detailed those the Supreme Court rejected as implausible in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). The plaintiff in *Twombly* had filed suit against telephone companies for engaging in a "conspiracy[ ] in restraint of trade or commerce" in violation of the Sherman Act, 15 U.S.C. § 1 *et seq.*, and loaded his complaint with allegations of "parallel conduct" by those companies in the attempt to infer a conspiracy between them. *Id.* at 548. The Court reasoned that "[w]ithout more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality." *Id.* at 557–58. Plaintiffs here, however, have provided more. Plaintiffs have not alleged innocuous conduct, but conduct that directly relates to the claims at issue: the automatic recording of all phone calls made from the call center. Similarly, Plaintiffs have not made a "bare assertion of conspiracy." *Id.* at 557. They have provided facts sufficient for a the court to infer that Lovelace and Lewis did, in fact, know they were making secret recordings and ordered their employees to continue without regard for the requirements of CIPA.

Defendants Lovelace and Lewis's Motion to Dismiss is denied.

### C.    Wells Fargo and First Data

Plaintiffs seek to hold Wells Fargo and First Data liable for the alleged secret recordings made by IPS because IPS acted as either "an agent or apparent agent of Wells Fargo [and First Data]" or as those Defendants' "partner or joint venturer." (*See* Am. Compl. ¶¶ 178, 190.) That is, Well Fargo and First Data may have vicarious liability for IPS's conduct, or they may be directly liable as a "person" who violated the CIPA. *See* Cal. Penal Code § 632(b) (defining a "person" to include a "partnership," "business association," or "other legal entity") Defendants Wells Fargo and First Data argue that the facts alleged are not sufficient to state a claim against them for IPS's alleged misconduct under either of Plaintiffs' theories, and seek dismissal under

Rule 12(b)(6). (Wells Fargo Opening Br. 8.) As the court agrees with Plaintiffs that their allegations are sufficient to hold Defendants Fargo and First Data vicariously liable for the actions taken by IPS (Pls. Resp. Br. 31-36), the Defendant's motion to dismiss is denied.[5]

Principals are vicariously liable for the torts committed by agents acting under apparent authority. *See Am. Soc. of Mech. Eng'rs, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 565–56 (1982). This rule applies to all agency relationships, not only to torts committed by employees acting within the scope of their employment.[6] *See* Restatement (Third) of Agency § 7.08 (Am. Law. Inst. 2006). The "essential characteristic of an agency relationship is the "right of control." *Edwards v. Freeman*, 34 Cal. 2d 589, 592, 212 P.2d 883, 884 (1949). Under California law, "[a]ctual authority is such as a principal intentionally confers upon the agent," typically by way of an express agreement. Cal. Civ. Code § 2316; *Van't Rood v. Cty. of Santa Clara*, 113 Cal. App. 4th 549, 571, 6 Cal. Rptr. 3d 746, 764 (6th Dist. 2003). Apparent authority, meanwhile, "is such as a principal, intentionally, or by want of care, causes or allows a third person to believe the agent to possess."[7] Cal. Civ. Code § 2317. An agent's apparent authority must be based on some conduct by the principal, but the principal need not make "explicit representations" regarding the agent's authority to a third party before apparent authority may be found. *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citing *Kaplan*

---

[5]    In light of this independent basis for denying the Defendants' motion to dismiss, the court does not reach the issue of whether Plaintiffs have alleged sufficient facts to establish a partnership or joint venture within the definition of CIPA.

[6]    Plaintiff suggests that the doctrine of *respondeat superior* applies in this dispute, and cites to several California cases regarding whether an alleged tort occurred within the scope of employment. (*See* Pls. Resp. Br. 32–35.) As Defendants recognize, however, those cases are inapposite. (Reply in Support of Wells Fargo MTD [125] ("Wells Fargo Reply Br."), 9–10.) *Respondeat superior* is a subset of the broader category of vicarious liability, and does not apply in this instance. *See Jones v. Federated Financial Reserve Corp.*, 144 F.3d 961, 965 (6th Cir. 1998) (describing the three types of common law vicarious liability as (1) express or implicit authorization of the agent's conduct, (2) apparent authority, and (3) *respondeat superior*).

[7]    California courts tend to use the phrase "ostensible authority" rather than "apparent authority." The terms are interchangeable. *See C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 479 n.7 (9th Cir. 2000). For the sake of consistency, this court will use "apparent authority."

*v. Coldwell Banker Residential Affiliates, Inc.*, 59 Cal. App. 4th 741, 747, 69 Cal. Rptr. 2d 640, 643 (6th Dist. 1997)).  For example, apparent authority may be found from the principal's representations to the public in general, or from the customs of the trade in question.  *Id.* Finally, "where the principal knows that the agent holds himself out as clothed with certain authority, and remains silent, such conduct on the part of the principal may give rise to liability" under the theory of apparent authority.  *Gulf Ins. Co. v. TIG Ins. Co.*, 86 Cal. App. 4th 422, 439, 103 Cal. Rptr. 2d 305, 317 (2001).

Plaintiffs have alleged numerous facts in support of the alleged agency relationship: the parties had a contractual agreement in which IPS would market Wells Fargo's and First Data's products and services; the overarching rules from VISA and Mastercard required the acquiring banks and processor TPAs (i.e., Wells Fargo and First Data) working within their systems to supervise the activities of sales TPAs like IPS; the parties all shared fees received as a result of each sale made; and First Data, acting at the behest of Wells Fargo, employed representatives assigned to IPS's facilities to supervise the telemarketing work and to ensure that IPS was in compliance the terms of the various governing agreements.  (Am. Compl. ¶¶ 50–55, 57, 58.) Wells Fargo and First Data are also alleged to have represented that agency relationship to the public at large by approving scripts in which IPS's telemarketers would state that they were calling on behalf of those organizations, and, in the case of First Data, advertising on its website and marketing materials that its "dealings with sales TPAs like IPS were 'partnerships.'" (*Id.* at ¶¶ 60, 61, 84.)  IPS is alleged to have done the same on its own website and marketing materials.  (*Id.*)  Overall, the Amended Complaint alleges facts that suggest a high level of control by Wells Fargo and First Data over IPS's activities.  Those alleged facts are more than enough to meet the pleading burden.  *See, e.g., Kaplan*, 59 Cal. App. 4th at 747, 69 Cal.Rptr.2d at 643 (finding that apparent authority could exist given a franchisee's authorized use of the franchisor's name and logo, despite contractual language requiring the franchisee to represent himself as an independent affiliate);  *Holt v. Kormann*, No. SACV 11–1047 DOC (MLG), 2012

WL 2150070, at *6 (C.D. Cal. June 12, 2012) ("[T]he purported agent's use of names and logos and the existence of a business relationship between the two entities showed made an ostensible agency relationship plausible[.]").

In a recent case in this court, *Heather McCombs, D.P.M., LLC v. Cayan LLC*, No. 15 C 10843, 2017 WL 1022013 (N.D. Ill. Mar. 16, 2017), Judge Durkin found similar facts sufficient to state a claim against Wells Fargo based on the conduct of an apparent agent in the context of the Telephone Consumer Protection Act, 47 U.S.C. § 227, *et seq.* *McCombs* involved unsolicited fax advertisements rather than recorded telemarketing calls, but, like this case, arose from efforts to market payment processing services. *Id.* at *1. Based on circumstances roughly similar to those alleged in this case, the *McCombs* court found the plaintiff's allegations were adequate to support her claim that the fax's sender was acting as an apparent agent of Wells Fargo:

> Here, Wells Fargo's name does appear on the fax, the fax does advertise services performed by Wells Fargo, and the fax contains a contract for services to which Wells Fargo is a necessary party. Moreover, the fax plainly indicates a contractual relationship between Wells Fargo and Capital Bankcard pursuant to which Capital Bankcard may solicit and service merchant business processed by Wells Fargo as the sponsoring bank . . . .
>
> **The Court fails to see the absurdity in the proposition that a sponsoring bank may be "on the hook" if a third-party [independent sales organization] solicits merchant business on its behalf and fails to follow the law.** This is not to say that bank liability is automatic under the circumstances. The "on-whose-behalf" inquiry is complicated one, and is better suited to resolution at the summary judgment stage than at the pleading stage.

*Id.* at *7 (emphasis added). *See also Helping Hand Caregivers, Ltd. v. Darden Rests., Inc.*, No. 14 CV 10127, 2015 WL 2330197, at *4 (N.D. Ill. May 14, 2015) (Shah, J.) (finding allegations of apparent agency in another "junk fax" case to be plausible where fax stated that the defendants were "teaming up" and described the principal's products as "our" products).

It is not seriously disputed that an actual agency relationship existed between IPS, Wells Fargo, and First Data for the express "purpose of [IPS's] solicitation of Merchants on behalf of [Wells Fargo and First Data]." (*See* Marketing Agreement § 20, Ex. A to Wells Fargo Opening

Br. [103-1].)  Rather, Defendants here argue that "IPS could not have been an agent (apparent or otherwise) of Wells Fargo or First Data in the solicitation of merchants if IPS was not fully complying with all Card Brand rules and all applicable state and federal law."  (Wells Fargo Opening Br. 9) (citing Marketing Agreement §§ 6, 29.)  That argument misrepresents apparent authority—a doctrine which is *conditioned* on an agent acting outside the scope of an express agreement.  *See generally* Restatement (Third) of Agency § 2.03 *cmt. c.* ("As to the third person, apparent authority when present trumps restrictions that the principal has privately imposed on the agent.")  The fact that the Marketing Agreement required the parties to "comply with all applicable law, regulations and Rules" is irrelevant.  (*See* Marketing Agreement § 29.) Defendants cite case law purporting to show that they cannot be held liable if IPS broke the law after being told not to, but the language of those cases shows that the opposite is true.  (*See* Wells Fargo Opening Br. 11.)  For example, in *Asplund v. Selected Investments in Financial Equities, Inc.*, 86 Cal. App. 4th 26, 103 Cal. Rptr. 2d 34 (4th Dist. 2000), the court stated that "the limitations set forth in the sales representatives agreement, coupled with the absence of substantial evidence of apparent or actual authority beyond that specified in the agreement, eliminates any basis upon which to impose vicarious liability[.]"  *Id.* at 49.  Defendants interpret that language to mean that, as a matter of law, the Marketing Agreement's prohibition on illegal conduct shields them from vicarious liability for IPS's conduct.  (Wells Fargo Opening Br. 11–12.)  But the *Asplund* court did not hold that language in the agreement by itself defeated a finding of apparent authority; it merely held that the facts did not otherwise support such a finding.  *Asplund*, 86 Cal. App. 4th at 49, 103 Cal. Rptr. 2d at 49.  That is not the case here.

Finally, the court briefly addresses one argument unique to Defendant First Data.  First Data argues that the Plaintiffs have based on their claims against First Data "on an improper inference, not facts."  (Wells Fargo Opening Br. 9.)  The Amended Complaint alleges that First Data knew about the existence of secret recordings because First Data would occasionally request and listen to the recordings in order to confirm successful sales of their hardware.  (Am.

Compl. ¶ 80.) These recordings, as Plaintiffs have repeatedly claimed, did not contain a warning, which Plaintiffs believe establishes that First Data had actual knowledge that the recordings were made without consent. (*Id.* at ¶ 81.) The problem with these allegations, as First Data rightfully points out, is that the putative class of Plaintiffs consists only of those California merchants who received telemarketing calls but did not sign contracts with the Defendants. (Wells Fargo Opening Br. 9) (citing Am. Compl. ¶ 109.) "Accordingly, any calls to which [Plaintiffs] allege First Data might have listened to necessarily excluded any calls with Plaintiffs and the putative class members." (*Id.* at 9–10.)

This court agrees with First Data's arguments, and concludes that Plaintiffs' allegations regarding recordings of confirmed sales do not plausibly relate to their stated claims for relief. *See Twombly*, 550 U.S. at 555. This does not require dismissal of the claims against Frist Data, however. Plaintiffs alleged that First Data did more than just listen to recordings of the completed sales: First Data assigned sales representatives to supervise and inspect IPS, exerted significant control over IPS's activities through the enforcement of the VISA rules, and held itself out as a "partner[ ]" of IPS. (Am. Compl. ¶¶ 55, 58, 82–84.) Finally, Plaintiffs allege that IPS personnel told First Data's sales representatives "that *all calls* to merchants were recorded and available to requested"—not just the ones relating to completed sales. (*Id.* at ¶ 80) (emphasis added). Likewise, the court finds that the Plaintiffs' allegations are not solely based on the receipt of such recordings. (*See* Wells Fargo Opening Br. 10–11) (citing *Warden v. Kahn*, 99 Cal. App. 3d 805, 815, 160 Cal. Rptr. 471, 478 (1st Dist. 1971) (holding that defendants who merely received a copy of a secretly recorded communication were not liable under CIPA sections 632 or 632.7)). Based on these additional facts, the court concludes that Plaintiffs' claim for relief against First Data survives this motion.

### D.     Fifth Third, Vantiv, and NPC

Defendants Fifth Third, Vantiv, and NPC have also moved to dismiss the Amended Complaint under Rule 12(b)(6). As stated, the facts alleged by Plaintiffs regarding Fifth Third's

involvement with the secret recording scheme are essentially identical to those Plaintiffs alleged against Wells Fargo. The same is true for Vantiv and NPC in relation to Wells Fargo's affiliated processor TPA, First Data. The motion by Defendants Fifth Third, Vantiv, and NPC is solely aimed at Plaintiffs' allegations that "Vantiv and NPC requested full-length copies of recorded phone calls in order to confirm sales." (Am. Compl. ¶¶ 90, 99, 102; Fifth Third Opening Br. 4–5.) Unlike Defendants Wells Fargo and First Data, these Defendants do not seek dismissal on the basis of objections to Plaintiffs' efforts to hold them directly and vicariously liable for the calls placed by IPS and Ironwood.[8] (Fifth Third Opening Br. 3 n.2.)

Defendants urge this court to dismiss Plaintiffs' claims "to the extent they are premised upon the alleged receipt of recordings or a ratification theory premised on the alleged receipt of recordings." (Reply Brief in Support of Fifth Third MTD [124] ("Fifth Third Reply Br."), 6.) But as with respect to First Data, the court concludes that Plaintiff's claim is not premised upon the alleged receipt of recordings, nor solely on the recordings involving completed sales. Defendants Fifth Third, Vantiv, and NPC's motion to dismiss is denied.

## 4.     Rule 11 Motions for Sanctions

The court turns, finally, to Defendants' argument that Plaintiffs' conduct in filing a complaint on the basis of Tibor's information violated Rule 11. In filing a pleading or motion with the court, a party "certifies that to the best of [its] knowledge, information, and belief, formed after an inquiry reasonable under the circumstances" any factual contentions contained therein "have" or "will likely have evidentiary support." FED. R. CIV. P. 11(b)(3). "[T]he central purpose of Rule 11 is to deter baseless filings in district court and thus . . . streamline the administration and procedure of the federal courts." *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 393 (1990) (internal citation omitted). Whether to sanction a party for failing to comply with Rule 11 is within the court's sound discretion. *Id.* at 405.

---

[8]     Although Fifth Third, Vantiv, and NPC "strongly dispute Plaintiffs' claims of any agency, partnership or joint-venture relationship with Ironwood," they state that they reserve those issues for a future summary judgment motion. (Fifth Third Opening Br. 3 n.2.)

When weighing Rule 11 sanctions, the focus is on what counsel knew at the time he filed the complaint. *Corley v. Rosewood Care Center, Inc. of Peoria*, 388 F.3d 990, 1014 (7th Cir. 2004). "A litigant's obligations with respect to the contents of [pleadings, written motions, and other documents]" do not end there, however, and "include reaffirming to the court and advocating positions contained in those pleadings and motions after learning that they cease to have any merit." FED. R. CIV. P. 11 advisory committee's note (1993 amendments); *see also Parker v. Vigo County School Corp.*, No. 98–133–C–T/H, 2000 WL 33125132, at *2 n.3 (S.D. Ind. Dec. 20, 2000). Parties and their attorneys are entitled to rely on the statements and reports of others, but only for so long as they can be satisfied that the evidence is competent or trustworthy. *See In re Air Disaster at Lockerbie, Scotland, on Dec. 21, 1988*, 144 F.R.D. 613, 617 (E.D.N.Y. 1992) (citing *Samuels v. Wilder*, 906 F.2d 272, 274 (7th Cir. 1990). An attorney does not need to possess proof enough to establish his case before filing suit, but he must show that he conducted a reasonable investigation of the factual support he relies upon in his complaint. *Samuels*, 906 F.2d at 274. In the case of fabricated documents, both the parties who fabricate documents and the lawyers who fail to inquire into their validity may be sanctioned. *Jimenez v. Madison Area Technical College*, 321 F.3d 652, 655–56 (7th. Cir. 2003).

This is an unusual case. Parties do not normally move to sanction opposing counsel until after at least some discovery has occurred. The Defendants here, however, claim that the Amended Complaint is based on "demonstrably falsified" information, due to their prior experiences with James Tibor. (IPS Defs. Supp. Sanctions Memo 4.) The court has analyzed the merits of Defendants' Motions to Dismiss as usual, in light of the presumption of truthfulness afforded to plaintiffs at this stage in litigation, and in light of counsel's assurances that they performed due diligence. *Iqbal*, 556 U.S. at 678. This does not mean the court is not troubled by the concerns raised by this motion.

It is clear to this court that Plaintiffs' lawsuit relies at least in part on the word of James Tibor. The Amended Complaint admits as much, stating that the Cherry Firm and, later, the named Plaintiffs only knew about the alleged secret recordings because Tibor reached out to them with information. (Am. Compl. ¶ 104.) Attorney Zolna underscored the Plaintiffs' reliance on Tibor at the hearing held on March 15, 2017. When this court asked how anyone could know they were being secretly recorded during a phone call, Zolna responded, "[w]ell, we did get information from a former employee that these calls were recorded." (3/15/17 Hearing Tr. 9:1–2.) Plaintiffs' counsel has nevertheless denied that they ever relied on the specific falsified e-mails to support their case. (*See* 4/27/17 Zolna Letter.) On its face, the Amended Complaint supports this argument. The Amended Complaint specifically mentions that Tibor warned the Defendants during phone calls or in-person meetings, not via e-mail. (Am. Compl. ¶¶ 75, 94.)

Plaintiff's counsel also defends Tibor by stating that all of his information has been corroborated. (*See* 4/27/17 Zolna Letter.) In this regard, the court is satisfied that Plaintiffs' counsel is telling the truth. The early discovery in this case proves that Defendants did record calls placed to California businesses—Plaintiffs possess over 40,000 of them already. Furthermore, Ironwood's e-mails disclosed by Plaintiffs in support of their various evidentiary motions strongly suggest that Ironwood engaged in a cover-up. Such behavior is hardly consistent with a strong defense on the merits of the Plaintiffs' case.

The court indeed recognizes that Defendants have presented evidence of Tibor's "documented fraud *as it relates to this case.*" (IPS Defs. Supp. Sanctions Memo 13) (emphasis in original). The court nevertheless declines to issue sanctions at this stage. As Plaintiffs' counsel notes: "[s]imply because [Tibor] may have also asserted these same *true* facts does not make them any less true." (4/15/17 Zolna Letter.) This appears to be the most likely scenario: Tibor could have forged the e-mails based on his memory of real conversations as an act of retaliation against Ironwood. More information is required. The court cautions Plaintiffs'

counsel, however, that it would be objectively unreasonable for them to have relied solely on Tibor as the source of their information.

## CONCLUSION

The Defendants' Motions to Dismiss [94, 97, 102, 105, 109], and Motions for Rule 11 Sanctions [119, 129] are DENIED.  Defendants are directed to file their answers within 21 days.

ENTER:

Dated: March 29, 2018

_____
REBECCA R. PALLMEYER
United States District Judge